## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

KATHRYN A. RICHARDSON,         )
TRUSTEE FOR THE KATHRYN A.     )
BILSKI REVOCABLE TRUST;       )
KATHRYN A. RICHARDSON,         )     CASE NO. 1:24-cv-980
TRUSTEE FOR THE CAROL A.       )
RICHARDSON TRUST; JOANNE     )     JUDGE _____
HOLIDAY, TRUSTEE FOR THE JOANNE )
MARIE HOLIDAY REVOCABLE     )
TRUST DATED APRIL 11, 2016; ELIE  )
MERHEB; ELIE MERHEB, TRUSTEE  )
FOR THE ELIE N. MERHEB        )
REVOCABLE TRUST; YTH 003, LLC;  )
AMBER TULLY; JOHN OWEN TULLY; )
BRETT MCCOY; SUNDAR        )
MANICKAM; SOUNDHARIA      )
MANICKAM; MARC MAZUR       )
CONSULTANTS, INC; CARA ZALE,   )     **COMPLAINT**
LLC; TERRI CROCKER, TRUSTEE FOR )
THE JOSEPH K. CROCKER 2018    )     **JURY TRIAL DEMANDED**
IRREVOCABLE TRUST; SAMIR     )
HAIKAL; JUNTO GREEN, LLC; TEAM )
HARRIS 14, LLC; GARY HARRIS,    )
TRUSTEE FOR THE NINE FOURTEEN )
LIVING TRUST; and ROSS TRAVIS,   )
                               )
        Plaintiffs,         )
                               )
v.                              )
                               )
SIDDHARTH JAWAHAR; FABIAN    )
URQUIJO; FRANK KRASOVEC;     )
ZOHAR ZIV; SWIFTARC VENTURES, )
LLC; SWIFTARC TELEHEALTH LABS )
FUND LP; SWIFTARC TELEHEALTH  )
LABS FUND GP, LLC; SWIFTARC   )
VENTURES LAB FUND LP;       )
SWIFTARC VENTURES LAB GP, LLC; )
BEAUTY GENERATIONS FUND I, LP )
F/K/A SWIFTARC BEAUTY FUND LP; )
SWIFTARC BEAUTY FUND GP, LLC;  )
AND SV LABS SPV II, LP,        )
                               )
        Defendants.

## NATURE OF CASE

1.      This action arises from an investment fraud scheme that Defendants perpetrated against the Plaintiffs, which resulted in millions of dollars in loss. Siddarth Jawahar ("Jawahar"), the lead Defendant who has also been federally charged, targeted and encouraged Plaintiffs to invest in the various Swiftarc Entities through various material misrepresentations. In reality, Jawahar ran the Swiftarc Entities as a classic Ponzi scheme: using new investor funds to pay existing obligations to others and fund his extravagant lifestyle.

2.      Along with Jawahar, Defendants Frank Krasovec ("Krasovec") and Zohar Ziv ("Ziv")—both General Partners—and Defendant Fabian Urquijo ("Urquijo") controlled the Swiftarc Entities. As detailed below, Plaintiffs agreed to invest with Jawahar because of the multiple representations that Krasovec and Ziv, both independently successful businessmen, had partnered with Jawahar and were purportedly involved with the business. Krasovec was presented as a long-time business partner of Jawahar and he directly solicited Plaintiffs to invest. Krasovec's and Ziv's representations, as well as their heavily pushed business acumen, gave Plaintiffs comfort that investing with the Swiftarc Entities was a legitimate, sound business decision. The truth, however, was starkly different.

3.      From the start, Krasovec and Ziv misrepresented their involvement with the Swiftarc Entities; misrepresented Jawahar's abilities, as well as his integrity; misrepresented the safety and soundness of investments; failed to disclose material information like civil lawsuits, regulatory investigations, and criminal investigations into Jawahar; failed to stop Jawahar despite known fraudulent behavior; and, ultimately, protected their own interests at the expenses of Plaintiffs by orchestrating their exit from the Swiftarc Entities.

4. However, Plaintiffs eventually came to learn the real reasons the General Partners fled the Swiftarc Entities – Jawahar's prolific deceit and misuse of the Plaintiffs' capital. By this point, it was too late. Despite various pleas, redemption requests, demands for accounting, and other similar efforts, Plaintiffs could not recover their capital.

5. For his behavior, on December 20, 2023, Jawahar was indicted by a federal grand jury. *See generally* ECF No. 1, *United States v. Jawahar*, No. 4:23-CR-00718-MTS-SPM (E.D. Mo.) (hereinafter, the "Indictment").

6. After countless failed attempts to recover their investments—or even get proof that any investments were made, and their money was not squandered—Plaintiffs bring this Complaint to hold accountable Jawahar for his extensive fraud and his business partners who facilitated, turned a blind eye, and let it happen.

**PARTIES**

7. Plaintiff Kathryn Richardson, Trustee for the Kathryn A. Bilski Revocable Trust ("Bilski Trust") is formed under the laws of Ohio.

8. Plaintiff Kathryn Richardson, Trustee for the Carol A. Richardson Trust ("Carol A. Richardson Trust") is formed under the laws of Ohio. Collectively, the Carol A. Richardson Trust and the Bilski Trust are known as the "Richardson Trusts."

9. Plaintiff Joanne M. Holiday, Trustee for the Joanne Marie Holiday Revocable Trust Dated April 11, 2016 ("Holiday Trust") is formed under the laws of Ohio.

10. Plaintiff Elie Merheb ("Elie") is a resident of Brecksville, Ohio.

11. Plaintiff Elie Merheb, Trustee for the Elie N. Merheb Revocable Trust ("Merheb Trust") is formed under the laws of Ohio. Collectively, Elie and the Merheb Trust are known as "Merheb."

– 3 –

12.    Plaintiff YTH 003, LLC ("YTH 003") is a Delaware limited liability company.

13.    Plaintiffs Amber and John Tully (the "Tullys") are residents of Rocky River, Ohio.

14.    Plaintiff Brett McCoy ("McCoy") is a resident of Cleveland, Ohio.

15.    Plaintiffs Sundar and Soundharia Manickam (the "Manickams") are residents of Avon, Ohio.

16.    Plaintiff Marc Mazur Consultants, Inc. ("Mazur Consultants") is a New York corporation with its principal place of business in New York.

17.    Plaintiff Cara Zale, LLC ("Cara Zale") is an Ohio limited liability company.

18.    Plaintiff Terri Crocker, Trustee for the Joseph K. Crocker 2018 Irrevocable Trust (the "Crocker Trust"), is formed under the laws of Ohio.

19.    Plaintiff Samir Haikal ("Haikal") is a resident of Lakewood, Ohio.

20.    Plaintiff Junto Green, LLC ("Junto Green") is a Wyoming limited liability company.

21.    Plaintiff Team Harris 14, LLC ("Team Harris") is an Indiana limited liability company.

22.    Plaintiff Gary Harris, Trustee for Nine Fourteen Living Trust ("Nine Fourteen Trust") is formed under the laws of Indiana. Collectively, Team Harris and Nine Fourteen are known as "Harris."

23.    Plaintiff Ross Travis ("Travis") is a resident of Chaska, Minnesota.

24.    Plaintiffs identified in the above Paragraphs are purchasers of securities in the form of limited partnership interests in the Swiftarc Funds (defined below). They will be referred to collectively as "Plaintiffs."

– 4 –

25.     Prior to his incarceration, Defendant Siddharth Jawahar ("Jawahar") resided within the Northern District of Ohio, specifically, Cuyahoga County, Ohio.

26.     Defendant Frank Krasovec (hereafter "Krasovec") is a resident of Travis County, Texas, specifically, Austin, Texas.

27.     Defendant Zohar Ziv (hereafter "Ziv") is a resident of Santa Barbara County, California. Ziv, Krasovec, and Jawahar are collectively referred to as the "General Partners."

28.     Upon information and belief, Defendant Fabian Urquijo (hereafter "Urquijo") is a resident of Miami-Dade County, Florida

29.     Defendant Swiftarc Ventures, LLC (hereafter, "Swiftarc Ventures") is a Texas limited liability company, with a principal place of business in Miami, Florida. Upon information and belief, at least one of its members resided in Cuyahoga County, Ohio.

30.     Defendant Swiftarc Telehealth Labs Fund LP (hereafter, the "Telehealth Fund") is a Delaware limited partnership with its principal place of business in New York, New York. Certain partners of the Telehealth Fund are residents of Cuyahoga County, Ohio.

31.     Defendant Swiftarc Telehealth Labs Fund GP, LLC (hereafter, the "Telehealth GP LLC") is a Delaware limited liability company with its principal place of business in Miami, Florida. Upon information and belief, at least one of its members resided in Cuyahoga County, Ohio.

32.     Defendant Swiftarc Venture Labs Fund LP (hereafter, the "Labs Fund") is a Delaware limited partnership with its principal place of business in Miami, Florida. Certain partners of the Labs Fund are residents of Cuyahoga County, Ohio.

33.     Defendant Swiftarc Venture Labs Fund GP, LLC (hereafter, the "Labs GP LLC") is a Delaware limited liability company with its principal place of business in Miami, Florida. Upon information and belief, at least one of its members resided in Cuyahoga County, Ohio.

34.     Defendant Swiftarc Beauty Fund, LP (hereafter, the "Beauty Fund") is a Delaware limited partnership with its principal place of business in Miami, Florida. Certain partners of the Beauty Fund are residents of Cuyahoga County, Ohio. On or about April 16, 2023, as discussed further below, the Beauty Fund changed its name to Beauty Generations Fund I, LP.

35.     Defendant Swiftarc Beauty Fund GP, LLC (hereafter, the "Beauty GP LLC") (collectively, along with the Telehealth GP LLC and the Labs GP LLC, the "GP LLCs") is a Delaware limited liability company with its principal place of business in Miami, Florida. Upon information and belief, at least one of its members resided in Cuyahoga County, Ohio. At all relevant times, Beauty GP LLC served as the general partner of the Beauty Fund.

36.     Upon information and belief, Defendant SV Labs SPV I, LP a/k/a SV Labs SPV II, LP (hereafter, "Labs SPV") (collectively, along with the Telehealth Fund, Labs Fund, and the Beauty Fund, the "Swiftarc Funds") is a Delaware limited partnership with its principal place of business in New York, New York. Upon information and belief, Labs GP LLC is the sole general partner of Labs SPV.

37.     Collectively, Swiftarc Ventures, the Swiftarc Funds, and the GP LLCs are referred to as the "Swiftarc Entities."

### JURISDICTION AND VENUE

38.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because federal questions are raised, namely claims under the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.*

39.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as each claim arises out of the same transactions involved in the federal questions.

40.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action, is situated in this District. Moreover, under 28 U.S.C. § 1391(b)(3), Defendants are subject to this Court's personal jurisdiction with respect to this action.

41.     Finally, many of the parties, including certain partners of the Swiftarc Entities, established domiciles within the Northern District of Ohio.

## BACKGROUND

42.      To introduce Swiftarc Venture's executive management team to Plaintiffs, Defendants circulated various marketing material. An example of such is attached hereto as Exhibit 1 (the "Executive Management Overview" or the "Overview").

43.     According to the Overview, Swiftarc Ventures had "over multiple decades of experience across the entire consumer & healthcare investment and executive spectrum, from growing pre-revenue concepts to managing operations for multi-billion dollar Fortune 500 companies."

44.     In the following order, Swiftarc Ventures identified its Executive Management Team as follows: Krasovec first; next, Ziv; then, Jawahar; and finally, Urquijo.

45.     According to the Overview, Krasovec is "a Co-Founder, General Partner and Executive Chairman of Swiftarc and his advisory firm, Norwood Investment. Mr. Krasovec has co-founded, actively invested, and helped operationally scale 12 companies with successful monetizations including 7 IPOs over his career. . . . Currently, Frank serves as Chairman, Co-

Founder and primary sponsor of Dash Brands, a major quick service restaurant platform in China, Hong Kong, and Macau that have distribution rights to Domino's Pizza across all of China."

46.     Also, according to the Overview, Ziv is "a Co-Founder and General Partner of Swiftarc, is an active angel investor and has over 25 years of executive management experience and a successful track record in growing companies across various environments, including large to small size and public and private companies, rapid growth, and managed over 25 M&A transactions. He served as COO of a $1.8BN footwear brand, CFO of public & private companies, co-founder and primary sponsor of Dash Brands in China, and a director & advisor to two private footwear, facial recognition & digital media firms."

47.     Similarly, the Overview provides that Jawahar is "the Founder, Managing Partner, and Chairman of the Swiftarc [Entities] which focuses on the Consumer and Consumer Health Industries across different geographies and life cycles." The remainder of Jawahar's biography identified Swiftarc's portfolio industries.

48.     The Overview states Urquijo is "President of Swiftarc Ventures and served as Global Chief Marketing Officer of the Professional Division and SVP, Marketing of the Portfolio Brands division at Revlon. He oversaw the Male Grooming, Professional Color Care, Professional & Consumer Nail Color & Care, Color Cosmetics, and Personal Care divisions. Prior to Revlon, [Urquijo] was with Proctor & Gamble for 19 years managing the Hair, Home, Health, Oral and Fabric Care divisions across Argentina, Venezuela, Panama, and the US."

49.     Later in the Overview, and in other marketing materials, the core team and executive management are predominantly identified as Krasovec, Ziv, Jawahar, and Urquijo, in that order.

50.     Swiftarc Ventures heavily relied upon, and leveraged, Krasovec's and Ziv's experience and involvement to entice Plaintiffs to invest with Jawahar and the Swiftarc Entities.

### SWIFTARC CAPITAL, LLC

51.     Swiftarc Capital, LLC and Swiftarc Fund, LP (collectively, "Swiftarc Capital") were predecessors to the Swiftarc Entities. Both Jawahar and Krasovec were general partners of Swiftarc Capital. Upon information and belief, Ziv was a general partner of Swiftarc Capital. As discussed in greater detail below, Jawahar's Ponzi scheme was born with Swiftarc Capital, and Jawahar's "father like figure" Krasovec watched it develop.

52.     According to Jawahar's Indictment, Jawahar "***and others*** created Swiftarc Capital [as] an investment company registered to do business in Texas" in December of 2010. Indictment, ¶ 3 (emphasis added).

53.     Krasovec was Jawahar's partner in Swiftarc Capital, at least beginning in September 2016, if not earlier.

54.     Swiftarc Capital operated like its soon-to-be-formed cousin, the Swiftarc Entities. Specifically, with help from its general partners, Swiftarc Capital solicited funds from investors, offered limited partnership interests to those investors, and invested that capital with third-party companies.

55.     The older cousin Swiftarc Capital even marketed itself as investing in "hot" and "catchy" similar "consumer-related services," specifically in "undervalued consumer companies in emerging and frontier markets across Asia, Africa, and Latin America."[1]

---

[1] *See* the Arizona Litigation, Complaint (ECF No. 1) at ¶ 21, discussed further below.

56.  Beginning in 2015, and continuing through 2019, Swiftarc Capital invested primarily in one security (the "PMP Security"), increasing its position from 54% to 99% throughout 2019. Indictment, ¶ 4.

57.  This single position created significant risk for the investors in Swiftarc Capital, risk that the investors neither expected nor agreed to.

### SWIFTARC VENTURES, LLC

58.  As early as February 2019, investors in Swiftarc Capital began demanding the return of their capital in the form of redemptions.

59.  Unbeknownst to them, Jawahar pivoted from and effectively abandoned Swiftarc Capital, and he formed Swiftarc Ventures, LLC just a month prior in January 2019, as a Texas limited liability company.

60.  Krasovec jumped the sinking Swiftarc Capital ship as well, and "co-founded" Swiftarc Ventures. Again, Krasovec identified himself as part of Swiftarc Ventures' executive management team.

61.  Ziv likewise joined Jawahar and Krasovec, "co-founded" Swiftarc Ventures, and joined the executive management team. Ziv's own social media posts confirmed the same, identifying himself as the "Co-Founder, General Partner":



62.  Since at least August 2019, Urquijo was part of the Swiftarc Ventures team. Urquijo served as the President of Swiftarc Ventures, as well as Jawahar's right-hand man.

63.     While not known to potential investors at the time, upon information and belief, Krasovec, Ziv, and Jawahar formed Swiftarc Ventures to avoid their obligations arising from Swiftarc Capital. As a bonus, Swiftarc Ventures allowed Krasovec, Ziv, and Jawahar to identify and target new investors unaware of Defendants and their prior behavior.

### SWIFTARC CAPITAL'S LEGAL CONCERNS

64.     While Jawahar, Krasovec, Ziv, and Urquijo got Swiftarc Ventures up and running, Jawahar's and Krasovec's Swiftarc Capital began to face significant legal issues.

65.     Not long after Swiftarc Ventures was founded, in February 2019, investors in Swiftarc Capital began demanding redemptions of their capital contributions. These requests for redemptions continued throughout 2019 and into 2020. During that time, Jawahar made numerous false promises to repay investors, but never did. Eventually, Jawahar stopped communicating with Swiftarc Capital's investors altogether.

66.     By May 2020, Swiftarc Capital investors, primarily a group of Arizona physicians, had enough. On or about May 29, 2020, these investors sued Swiftarc Capital and Jawahar in the United States District Court for the District of Arizona, Docket No. 2:20-CV-1046-SRB (hereafter, the "Arizona Litigation"). The plaintiffs' claim was simple: "to recoup the monies they entrusted to Jawahar and [Swiftarc Capital]…and hold [Swiftarc Capital] accountable for their conduct and false and fraudulent statements." *See Arizona Digestive Health Ins. Co., LLC, et al. v. Siddharth Jawahar, et al.*, 2:20-cv-1046-SRB (Doc. 1, ¶ 8) (D. Ariz. May 29, 2020).

67.     After initially appearing in the Arizona Litigation, Jawahar and Swiftarc Capital stopped engaging in the litigation process. Instead, Jawahar created excuse after excuse as to why he and Swiftarc Capital could not respond to discovery requests. This continued for months.

68.     Ultimately, and as a sanction, the district court struck Jawahar and Swiftarc Capital's answer, and entered a default judgment against defendants on July 1, 2021.

69.     Upon information and belief, Krasovec and Ziv (general partners of Swiftarc Capital), and Urquijo knew of the Arizona Litigation. By the time a default judgment was entered against Swiftarc Capital, Krasovec, Ziv, and Urquijo had been engaged together on Swiftarc Ventures for two and a half years. For his part, Krasovec, a general partner in Swiftarc Capital, since at least 2016, knew or should have known about the fraud his business partner inflicted on the Swiftarc Capital investors.

70.     On or about September 10, 2021, a different group of plaintiffs filed suit against Jawahar and Swiftarc Capital in the District Court for Travis County, Texas at Docket No. D-1-GN-21-005115 (hereafter, the "Texas Civil Litigation"). The plaintiffs in that action brought claims for breach of contract, breach of fiduciary duty, and conspiracy.

71.     In the Texas Civil Litigation, the plaintiffs sought redemption of their investment from Jawahar and Swiftarc Capital. Jawahar informed the plaintiffs that 10% of each redemption needed to be held back until a final valuation of each plaintiff's investment could be made and, once those valuations were made, the plaintiffs would be entitled to the amounts held back. While the bulk of the investments were repaid, the amounts held back were not. Like in the Arizona Litigation, Jawahar strung the plaintiffs of the Texas Civil Litigation along, being "vague about when and how [Jawahar and Swiftarc Capital would] return [p]laintiffs' investments." Ultimately, when Jawahar failed to reimburse the amounts held back, the plaintiffs sued.

72.     On or about October 25, 2021, the plaintiffs in that action filed a motion for alternative service. Yet again, defendants failed to appear. On or about June 14, 2022, the District Court for Travis County, Texas entered a default judgment against Jawahar and Swiftarc Capital.

– 12 –

73.     Upon information and belief, Krasovec, Ziv, and Urquijo likewise knew of the Texas Civil Litigation during this time. By the time a default judgment was entered against Swiftarc Capital in Texas Civil Litigation, Krasovec, Ziv, and Urquijo had been engaged together on Swiftarc Ventures for almost three and a half years. For his part, Krasovec, a general partner in Swiftarc Capital, since at least 2016, knew or should have known about the fraud his business partner inflicted on the Swiftarc Capital investors.

### THE SWIFTARC ENTITIES

74.     As previously stated, the Swiftarc Entities were organized like their predecessor Swiftarc Capital.

75.     This included three primary investment funds, each one a distinct limited partnership: the Telehealth Fund, the Labs Fund, and the Beauty Fund.

76.     As mentioned above, each of the Swiftarc Funds had its own General Partner Entities: Telehealth GP LLC, Labs GP LLC, and Beauty GP LLC.

77.     Upon information and belief, Krasovec, Ziv, and Jawahar were members of the GP LLCs.

78.     Swiftarc Ventures acted as the investment manager for each of the Swiftarc Funds.

79.     There were also "sidecar" investment opportunities presented to certain Plaintiffs through Swiftarc Ventures. For example, Defendant Labs SPV offered an opportunity for Plaintiffs to invest in one specific company apart from and in addition to, the Labs Fund portfolio.

80.     According to marketing materials, such as the Overview discussed above, the Swiftarc Funds operated as targeted early and growth stage venture capital funds. Through Swiftarc Ventures and its executives, Krasovec, Ziv, Jawahar and Urquijo solicited investments by offering limited partner interests to Plaintiffs. Investments were induced based on Confidential

Private Placement Memoranda (hereafter "PPMs"), Subscription Agreements, and Limited Partnership Agreement (hereafter, "LPAs") (together with the PPMs and the subscription Agreements, the "Offering Documents"). An example PPM, Subscription Agreement, and LPA from the Beauty Fund are attached hereto as Exhibits 2, 3, and 4, respectively.

81.     Along with the Offering Documents, Swiftarc Ventures created and published several documents to prospective and current investors that described purported portfolio companies and the management structure of Swiftarc Ventures (hereafter, the "Marketing Materials"). An example of the Marketing Materials is reflected in Exhibit 1, the Executive Management Overview. Additional Marketing Materials are attached herein as Exhibit 5.

82.     Since their inception, each of the Swiftarc Funds offered limited partnership interests to investors, including Plaintiffs.

83.     When a potential investor was identified, they received Offering Documents and Marketing Materials.

84.     The Offering Documents and Marketing Materials contained several material misrepresentations about the Swiftarc Funds and the relationship between the Swiftarc Entities and limited partners. For example, the documents represented:

  a.     That the Swiftarc Funds would deploy investor capital into investments with targeted portfolio companies, rather than fund Jawahar's lavish lifestyle or to repay prior investors.

  b.     That the limited partners would receive annual audited financial statements and annual reports, including an overview of the portfolio.

  c.     That the limited partners would receive quarterly valuations of the portfolio.

      d.      That the limited partners would receive quarterly summaries of new investments and dispositions made during the previous quarter.

      e.      That the limited partners would receive scheduled K-1 tax forms and any other tax information reasonably requested by a limited partner.

85.     Jawahar and Urquijo ran the day-to-day business of the Swiftarc Entities. This included access to bank accounts, solicitation of investors, creation and circulation of marketing materials, as well as hiring and firing decisions.

86.     Krasovec and Ziv maintained executive-level roles in the Swiftarc Entities. As an example, Swiftarc Ventures created an "investment committee" that approved the portfolio companies the Swiftarc Funds invested in. This investment committee consisted of just three members: Krasovec, Ziv, and Jawahar.

87.     Krasovec was also involved in the day-to-day operations of Swiftarc Ventures. He solicited new investors. For example, Krasovec spoke with investors over video calls. He also attended an event at the high-end Marble Room steakhouse in Cleveland, Ohio, where he, along with Jawahar, encouraged a room full of potential investors, including Dr. Holiday and Ms. Richardson, authorized individuals of Plaintiffs Holiday Trust and Richardson Trusts, respectively, to invest in the Beauty Fund. Krasovec also cohosted an event with Jawahar at Taza Restaurant in downtown Cleveland to solicit new investors, including Plaintiff Elie Merheb.

88.     In terms of financials, upon information and belief, Krasovec had access to bank accounts where investor funds were transferred. Krasovec also considered redemption requests.

89.     Krasovec was also crucial for establishing partnerships between Swiftarc Ventures and third parties. For example, on or about April 29, 2021, Krasovec, Jawahar and others at Swiftarc Ventures, including Swiftarc Ventures employee EMPLOYEE 1, met in Cleveland, Ohio

and toured the offices of Nottingham Spirk, an innovation consulting and product design company, to discuss one of Swiftarc Ventures portfolio companies. Following that meeting, Swiftarc Ventures promoted a partnership with Nottingham Spirk. That partnership was material information for several Plaintiffs, including Plaintiffs Junto Green, Harris, and Travis. However, the partnership with Nottingham Spirk never happened and Swiftarc Ventures, including Jawahar and Krasovec, never informed Plaintiffs of this fact.

90.     Likewise, Ziv was regularly involved in the day-to-day operations of Swiftarc Ventures. He helped solicit new investors and worked closely with them upon their investment. For example, on or about January 22, 2020, Ziv, Jawahar, Urquijo and other Swiftarc Venture representatives, including EMPLOYEE 1, attended an NBA game with the goal to secure investments into the Swiftarc Funds.

91.     Ziv also contributed to, and approved, Marketing Materials. He chaired the "Governance Committee" of Swiftarc Ventures and made hiring decisions along with Jawahar and Krasovec. Finally, like Krasovec, Ziv maintained access to certain bank accounts that held investor's capital.

92.     As stated above and reflected further below, Plaintiffs invested due to the involvement of, and representation from and regarding, Krasovec and Ziv.

**TEXAS REGULATORY AGENCY TO JAWAHAR & SWIFTARC: STOP COMMITTING FRAUD**

93.     Upon organizing Swiftarc Ventures and the various Swiftarc Funds, Jawahar, Krasovec, Ziv, and Urquijo began soliciting capital from Plaintiffs. Between, on or about November 23, 2020, and June 1, 2022, certain Plaintiffs, as explained below, invested at least $1,625,000 with the Swiftarc Entities.

94.     Unbeknownst to Plaintiffs at the time of the above investments, the Texas State Securities Board (hereafter, "TSSB") was investigating Jawahar and Swiftarc Capital for allegations similar to those alleged in the Arizona and Texas Civil Litigations.

95.     Upon information and belief, TSSB's investigation was known, or should have been known, by Krasovec, Ziv, and Urquijo.

96.     TSSB's investigation culminated with a consented disciplinary order against Jawahar and Swiftarc Capital, entered on June 7, 2022 (the "TSSB Order"). A true and accurate copy of the TSSB Order is attached and incorporated as Exhibit 6.

97.     As reflected in the TSSB Order, TSSB, Jawahar, and Swiftarc Capital agreed that Jawahar and Swiftarc Capital breached their fiduciary duties to their clients and that their actions constituted fraud and a fraudulent business practice under Section 4001.058 of the Texas Securities Act.

98.     Moreover, TSSB, Jawahar, and Swiftarc Capital agreed that Jawahar and Swiftarc Capital failed to send annual audits to investors.

99.     Additionally, TSSB, Jawahar, and Swiftarc Capital agreed that Jawahar and Swiftarc Capital solicited an investment to repay portions of redemption requests in a Ponzi-like style.

100.    As a result, TSSB revoked the investment adviser registration of Swiftarc Capital.

101.    TSSB further ordered that both Swiftarc Capital and Jawahar "immediately CEASE AND DESIST from engaging in fraud." *See* Exhibit 6, p. 6.

102.    For his part, Krasovec was not named in this order, but his involvement in Swiftarc Capital was investigated by TSSB. Upon information and belief, Krasovec, as a General Partner

of Swiftarc Capital and long-time business partner of Jawahar, was fully informed and knew, or should have known, of TSSB's investigation and the subsequent TSSB Order.

103.    Upon information and belief, Krasovec, Ziv, Jawahar, and Urquijo failed to disclose to Plaintiffs the existence of the Arizona Litigation, the Texas Civil Litigation, and the TSSB Investigation and Order at any time prior to Plaintiffs' investments.

104.    The day after the TSSB Order, "Investor Relations" of Swiftarc Ventures, wrote, "[o]n behalf of the collective Swiftarc Ventures, *it's General Partners and Management*," a statement that concealed the true nature of the TSSB Investigation and Order. A copy of this statement (hereafter, the "Swiftarc Statement") is attached and incorporated as Exhibit 7.

105.    At the time of the Swiftarc Statement, Krasovec, Ziv, and Jawahar identified themselves as General Partners of Swiftarc Ventures. Jawahar and Urquijo identified themselves as Executive Management of Swiftarc Ventures.

106.    Defendants hoped that Plaintiffs would remain in the dark about the TSSB Order. Indeed, most did.

107.    Those Plaintiffs who learned of and contacted Jawahar about legal problems in Texas received the Swiftarc Statement. The Swiftarc Statement misrepresented the facts of the TSSB Order and spun the circumstances so that Jawahar, Swiftarc Capital, and its general partners appeared blameless. It also promised heightened compliance controls around Swiftarc Ventures which, based on the fraud Jawahar committed, was never fully implemented, if at all.

108.    In the Swiftarc Statement, Defendants stated that they wanted to "address a recent situation that prompted a negotiated order reached with" the TSSB. The statement assured that Swiftarc Capital "den[ied] wrongdoing *but* for the unethical actions of a former employee who went outside their mandate and landed [Swiftarc Capital] in the situation of an illiquid position

and holding." It explained that it "parted ways with a former employee" based on the "magnitude of the breach." The statement told Plaintiffs that "mistakes [were] made in oversight" as a result of the employee's actions and that "responsibility had to be taken for some of those prior issues to cleanly move on completely." In essence, Defendants falsely and fraudulently assured Plaintiffs that no one affiliated with Swiftarc Ventures engaged in any wrongdoing and that Swiftarc Capital and Jawahar merely fell on the sword based on a single, unnamed and unknown employee's actions. In fact, the Swiftarc Statement never actually states what happened except that there were "challenges of valuation, timing, liquidity and disclosure."

109.    The Swiftarc Statement was false and designed to conceal the true nature of the fraud. The TSSB Order explains that Jawahar himself directed employees to overvalue a security, which at one point made up 99% of Swiftarc Capital's investments, because the security was trading too thinly. *See* Exhibit 6 (TSSB Order), ¶ 12-13. On April 26, 2022, Jawahar was valuing that security at over 558% higher than its then-current trade price. Nowhere within its text does the TSSB Order reference an employee of Swiftarc Capital. It only mentions Jawahar.

110.    The TSSB Order also explains that, while Swiftarc Capital held an illiquid position and faced millions in redemption requests, Jawahar solicited $250,000 from an investor through material misrepresentations and immediately used those funds to partially redeem two earlier investors. The TSSB Order ultimately ordered that Jawahar and Swiftarc Capital—for which Krasovec served as general partner—cease and desist from engaging in fraud. The Swiftarc Statement issued by Defendants does not reference this Ponzi scheme act nor any fraud by Jawahar.

### Krasovec, Ziv, and Urquijo's Awareness of Jawahar's Actions

111.    Krasovec, Ziv, and Urquijo knew about the TSSB Order and participated directly in deciding Swiftarc Ventures' next steps. Indeed, to Plaintiffs, the Swiftarc Statement was written or authorized by Krasovec, Ziv, Jawahar, and Urquijo.

112.    Shortly after the TSSB Order was published, one Swiftarc Ventures employee who came to learn of it, EMPLOYEE 2, confronted Jawahar and Urquijo about the deceit. Among other things, EMPLOYEE 2 demanded to see evidence that, as to the Swiftarc Entities, Plaintiffs' money was invested as Defendants represented that it would be.

113.    Urquijo provided EMPLOYEE 2 with an Excel spreadsheet purporting to summarize bank statements of the Swiftarc Entities. This attempt to lull EMPLOYEE 2 into a false sense of security failed, and he demanded to review the actual accounts. Eventually, Jawahar and Urquijo acquiesced. Upon doing so, Jawahar and Urquijo verbally warned EMPLOYEE 2 that "you're not going to like what you see."

114.    After his initial review of the bank accounts, EMPLOYEE 2 learned that Swiftarc Ventures was comingling assets of each of the Swiftarc Funds. Jawahar and Urquijo described these transfers as "intercompany loans," whereby Jawahar and Urquijo would transfer funds, without the consent of the limited partners, between the several Swiftarc Funds' accounts to satisfy capital calls of portfolio companies or other expenses. As General Partners, Krasovec and Ziv had access to all these bank accounts. EMPLOYEE 2 also saw that upon receipt of funds from investors, including Plaintiffs, Swiftarc Ventures would immediately transfer the same or similar amounts to a different account. EMPLOYEE 2 never gained access to that separate account.

115.    Jawahar also transferred investments from limited partners—without their consent—to a different fund altogether. For example, EMPLOYEE 2 learned that when certain

Special Purpose Vehicle investments associated with Swiftarc Ventures ("SPV Investments") were not performing well, Jawahar liquidated the position and invested in other funds, all without the full knowledge or consent of the limited partners.

116.    EMPLOYEE 2 also discovered that some bank accounts had a balance of zero.

117.    Simultaneously with his demand from Jawahar and Urquijo, EMPLOYEE 2 shared his concerns with Ziv and Krasovec.

118.    In response, Ziv, ignoring his own fiduciary responsibilities, told EMPLOYEE 2 to "talk to Frank [Krasovec]."

119.    EMPLOYEE 2 did just that. On July 8, 2022, EMPLOYEE 2 emailed Krasovec. A copy of EMPLOYEE 2's July 8, 2022 email is attached and incorporated herein as Exhibit 8.

120.    EMPLOYEE 2's email reflects his concerns following the TSSB Order. Specifically, he tells Krasovec that Plaintiff YTH 003, LLC demanded a full accounting of its capital contributions, which Jawahar and Urquijo had failed to provide. Additionally, YTH 003 had not received proper reporting (*i.e.*, an IRS Schedule K-1) for its investments. Given Krasovec's role and experience, EMPLOYEE 2 sought Krasovec's "guidance" and "thoughts on all."

121.    Krasovec responded. His primary concern was to ensure YTH 003 was "fully funded," meaning that the General Partners had first and foremost taken all the money that YTH 003 committed, which was $1.1 million. Krasovec also admitted he knew about the TSSB investigation and the TSSB Order because TSSB "interviewed an investor I introduced to Swiftarc [Capital]." As for next steps, Krasovec intended to meet with Jawahar "in the next few days to review what you outlined and how to get K-1's etc., TSSB resolved, and reporting back to normal."

122.    Krasovec and Jawahar met soon after at Krasovec's residence in Vail, Colorado. They spent four days together.

– 21 –

123.     Separately, Jawahar described this meeting with Krasovec as their "annual father-son Vail visit."

124.     As a result of their time together, Krasovec wrote to EMPLOYEE 2 that Krasovec and Jawahar "are aligned with reporting and our fundraising and investment strategy for the balance of this year and into most of next year." *See* Exhibit 8.

125.     Following this email, Krasovec and Jawahar's demeanor towards EMPLOYEE 2 changed. They began to retaliate against EMPLOYEE 2 for questioning the General Partners' breaches and improprieties. For instance, in a telephone conversation with EMPLOYEE 2, Krasovec accused EMPLOYEE 2 of being disloyal and encouraged Jawahar to place EMPLOYEE 2 on paid leave.

126.     Jawahar did just that, placing EMPLOYEE 2 on paid leave. Jawahar and Krasovec's decision to place EMPLOYEE 2 on paid leave was retaliation and an attempt to silence him.

### THE BEAUTY FUND SWAP

127.     Krasovec and Jawahar's "alignment" did not include correcting the material misrepresentations the General Partners made at the time the investments were solicited, correcting the material misstatements in the Swiftarc Statement, disclosing the true nature of the TSSB Order, or addressing EMPLOYEE 2's concerns of financial impropriety.

128.     Instead, for the next several months, Defendants made everything with the Swiftarc Entities appear to be business as usual to Plaintiffs: Krasovec, Ziv, Jawahar, and Urquijo continued to serve as the executive leadership and solicitations of new investments continued.

129.     Behind the scenes, however, the reality was different. Soon after EMPLOYEE 2's forced leave, both Krasovec and Ziv, placing their own interests above that of the limited partners,

attempted to minimize their personal financial exposure from Jawahar's and Urquijo's fraudulent behavior and attempted to distance themselves from the Swiftarc Entities.

130.    To do so, Krasovec and Ziv, along with others, organized a restructuring of the Swiftarc Entities to attempt to cut off any potential liability that could befall upon them.

131.    To do so, Krasovec and Ziv engaged in a clandestine series of complicated corporate maneuvers, which included:

      a.      The incorporation of a new Delaware limited liability company known as Beauty Generations GP, LLC (the "**Beauty Generations GP**") to serve as the new general partner;

      b.      The change in name from Beauty Fund to Beauty Generations Fund I LP (the "**Beauty Generations Fund**");

      c.      The secret solicitation and engagement of an investment management firm known as Relevance Capital Management, LLC, a Tennessee limited liability company ("**Relevance Ventures**"); and

      d.      Preparations to transfer all funds from the Swiftarc Entities to the new Beauty Generations Fund – *i.e.*, the "Beauty Fund Swap."

132.    However, to accomplish the Beauty Fund Swap, Krasovec and Ziv needed Jawahar's consent.

133.    Rather than disclose the fraud to Plaintiffs, Krasovec, Ziv, and others, coerced Jawahar into consenting to the Beauty Fund Swap by threatening to file a Racketeer Influenced and Corrupt Organizations Act ("RICO") complaint against Jawahar.

134.    In a sense, rather than to kick Jawahar and his fraudulent behavior out, Krasovec and Ziv chose instead to, as the saying goes, "take [Plaintiffs'] money and run."

135.    Jawahar agreed with Krasovec's and Ziv's approach to keep Plaintiffs in the dark and assented to their demands: the movement of investor capital from the Swiftarc Entities to the control of Beauty Generations Fund and Relevance Ventures.

136.    In return, Jawahar and Urquijo remained as management for the Telehealth Fund and Labs Fund, with both Jawahar and Urquijo keeping and acquiring Krasovec's and Ziv's ownership interests in each Fund's GP LLCs. Swiftarc Ventures remained the investment manager for both funds. And Krasovec and Ziv jettisoned themselves from Jawahar's sinking ship, taking with them the Beauty Fund and the scant remnants of Plaintiffs' investments.

137.    Meanwhile, Plaintiffs remained in the dark, both as to the fraudulent conduct described above and to the devastating losses they suffered.

138.    With Jawahar on board, Krasovec and Ziv next needed consent from Swiftarc Beauty Fund investors, some of whom included Plaintiffs.

139.    To obtain the consent of the Plaintiffs, Krasovec and Ziv instructed Jawahar to manage that process, fully aware that Jawahar's lies would continue to shield their actions. In doing so, Jawahar, true to his nature, failed to fully inform Plaintiffs in the Swiftarc Beauty Fund of the true reason for the restructuring.

140.    The Closing Documents of the Beauty Fund Swap (which were never completely shared with Plaintiffs) stated some of the reasons that Krasovec and Ziv sought an exit from the Swiftarc Entities:

       a.     WHEREAS, on December 7, 2021, the United States District Court for the District of Arizona entered a default judgment against Jawahar, Swiftarc Capital LLC, and Swiftarc Fund LP related to delinquent redemption payments and rewarded plaintiffs approximately $5,000,000.00 in principal

repayment and associated interest payments related to certain allegations. . .; and

b.    WHEREAS, on June 7, 2022, the Texas State Securities Board entered a Disciplinary Order against Jawahar and Swiftarc Capital finding a breach of fiduciary duties and Swiftarc Capital's registration as an investment advisor was revoked[.]

141.    But Jawahar misrepresented to Plaintiffs that the Beauty Fund Swap occurred because of a difference in philosophy between Jawahar and the other General Partners. Jawahar told Plaintiffs that the General Partners' older ages caused divisions on how to manage socially conscious investment funds and that Jawahar was spending too much time managing the Beauty Fund to the detriment of the Telehealth Fund and the Labs Fund. Defendants knew that these statements were false.

142.    In subsequent written communications, Jawahar sent Swiftarc Beauty Fund Plaintiffs a consent agreement to the Beauty Fund Swap that did not contain any reference to the Arizona Litigation, the TSSB Order, or any of the several other true reasons why the Funds were failing.

143.    Believing Jawahar's misrepresentations, and not having been told the truth from Krasovec and Ziv, those Plaintiffs invested in the Swiftarc Beauty Fund, consented to the Beauty Fund Swap.

144.    On or about April 16, 2023, the Beauty Fund Swap closed and became effective.

145.    One month later, on or about May 23, 2023, Relevance Ventures (the new investment manager of the Beauty Generations Fund) contacted investors, including Plaintiffs, for the first time since the Beauty Fund Swap. Relevance Ventures disclosed, for the first time, that

the Beauty Fund Swap occurred in part because of Jawahar's past fraud. Specifically, Relevance Ventures explained that the Beauty Fund Swap occurred because of "the Texas State Securities Board's action against Swiftarc and Sid Jawahar . . . an Arizona judgment taken against Swiftarc and Jawahar by a group of plaintiffs in an amount in excess of $5MM . . . and [] apparent material amounts borrowed from various limited partnerships by other Swiftarc entities to fund various costs and expenses."

146. Defendants failed to disclose these critical, material facts to investors, including Plaintiffs, before the Beauty Fund Swap.

147. Instead, as alleged above, the Swiftarc Entities, Jawahar, Urquijo, Krasovec, and Ziv concealed the truth and maintained a "business as usual" approach following the TSSB Order and during the Beauty Fund Swap negotiations.

148. During that time, *i.e.*, the period following the TSSB Order, Plaintiffs invested, at minimum, $1,151,000 with the Swiftarc Entities.

149. Four investments, totaling over $293,000, occurred during a period where Jawahar, Krasovec, and Ziv agreed not to solicit new capital contributions as part of the Beauty Fund Swap.

### JAWAHAR INDICTED

150. On December 20, 2023, a federal grand jury sitting in the Eastern District of Missouri returned a four-count indictment against Jawahar, alleging three counts of wire fraud and one count of investment adviser fraud. Authorities arrested Jawahar on January 8, 2024, and he has been detained pending trial in the U.S. District Court for the Eastern District of Missouri.

151. According to Jawahar's Indictment, Jawahar utilized "intercompany loans" to redeem earlier investors, fund outstanding Swiftarc Ventures obligations, and "finance[e] flights

on private planes, stays at luxury hotels, and expensive outings at lavish restaurants." *See* Indictment, *United States v. Jawahar*, No. 4:23-CR-00718-MTS-SPM (E.D. Mo.) at ¶ 8.

152.    Jawahar's indictment alleges that, in total, Jawahar collected more than $35 million through Swiftarc Capital and the Swiftarc Entities from investors—to include Plaintiffs—yet only invested approximately $10 million into portfolio companies.

153.    Therefore, at least $25 million has been lost due to Jawahar's fraud.

154.    For their part, Krasovec, Ziv, and Urquijo, among other things, enabled and provided fertile opportunities for Jawahar's fraud to exist and flourish.

155.    Given their prominent marketing, representations, and roles, Krasovec and Ziv provided a veneer of legitimacy and experience that comforted Plaintiffs in investing millions of dollars with Swiftarc Ventures.

156.    Once Swiftarc Ventures received Plaintiffs' funds, Krasovec and Ziv completely abdicated their duties to Plaintiffs and failed to supervise Jawahar with the funds, despite Jawahar's lengthy history of misappropriating funds, which both Krasovec and Ziv knew about.

157.    Urquijo, as President, witnessed Jawahar's misappropriation firsthand, yet neglected to intervene.

158.    And then, when given yet another opportunity to disclose Jawahar's true scheme, Krasovec, Ziv, and Urquijo protected their own interests at Plaintiffs' expense. Krasovec, Ziv, and Urquijo instead concealed Jawahar's fraud, retaliated against whistleblowers like EMPLOYEE 2, and took steps to benefit and protect themselves.

159.    But for these actions, Jawahar's fraud would not and could not have continued unabated, sparing Plaintiffs from millions of dollars in loss along the way.

### ALLEGATIONS PERTAINING TO PLAINTIFFS' INDIVIDUAL INVESTMENTS

160.    The above allegations are common to all Plaintiffs. The following briefly sets forth allegations specific to each Plaintiff.

<u>The Richardson Trusts</u>

161.    The Carol Richardson Trust is an investor in the Telehealth Fund.

162.    The Bilski Trust is an investor in the Telehealth Fund, Labs Fund, and Beauty Fund.

163.    Ms. Richardson, the Trustee for the Richardson Trusts, attended the event at the Marble Room where Krasovec solicited investments into the Beauty Fund.

164.    On or about April 17, 2023 – the day after Krasovec and Ziv officially exited the Swiftarc Entities – Ms. Richardson was contacted by Jawahar and asked to fund her commitment to the Telehealth Fund. Ms. Richardson obliged, and, on April 28, 2023, wired a total of $124,999 to the Telehealth Fund.

165.    In total, the Richardson Trusts invested $791,666.33 in the Swiftarc Funds.

166.    The Richardson Trusts have been damaged at least $791,666.33 by Defendants' actions.

<u>The Holiday Trust</u>

167.    The Holiday Trust is an investor in the Telehealth Fund, Labs Fund, Beauty Fund and other funds organized by Jawahar and others.

168.    In total, the Holiday Trust invested $1,050,000 with Jawahar and the Swiftarc Funds.

169.    On one occasion, after the TSSB Order, on or about July 1, 2022, the Holiday Trust invested $250,000 in a sidecar deal based on Jawahar's representations. "Instead of making the

promised investment, however, [Jawahar] used the majority of the [Holiday Trust's] $250,000.00 investment to repay" a prior investor. Indictment, ¶ 15.

170.    In total, the Holiday Trust has been damaged at least $1,050,000 by Defendants' actions.

<u>Elie Merheb & Merheb Trust</u>

171.    Merheb is an investor in the Telehealth Fund, Labs Fund, and Beauty Fund.

172.    Before investing, Elie met Krasovec at an event at the restaurant Taza in Cleveland, Ohio. At that meeting, Krasovec presented alongside Jawahar to solicit investors for the Telehealth Fund. Krasovec provided credibility for the Telehealth Fund as Krasovec explained his successful track record and past investments.

173.    In total, Merheb invested $583,333 across all three Funds.

174.    In approximately January 2023, Elie demanded a return of his investment to Jawahar. No repayment was ever made. Instead, Jawahar lulled Elie into a false sense of security, assuring Elie that his investment was safe.

175.    As a result of Defendants' actions, Merheb suffered a loss of retirement, college education, and other savings amounts. Additionally, Merheb was forced to make changes to employment.

176.    In total, Merheb has been damaged at least $583,333 by Defendants' actions.

<u>YTH 003</u>

177.    YTH 003 is an investor in the Labs Fund.

178.    In total, YTH 003 invested $1,100,000 into the Labs Fund.

179.    As reflected above, soon after the TSSB Order, EMPLOYEE 2, on behalf of YTH 003, requested an accounting of YTH 003's investments.

180.    As reflected above, soon after the TSSB Order, EMPLOYEE 2, on behalf of YTH 003, informed both Krasovec and Ziv about his concerns with Jawahar and Urquijo.

181.    In response, EMPLOYEE 2 was placed on paid administrative leave from Swiftarc Ventures.

182.    In total, YTH 003 has been damaged at least $1,100,000 by Defendants' actions.

<u>The Tullys</u>

183.    Amber ("Amber") and John Owen Tully ("John") are married. Together, they invested $325,000 across the Beauty Fund and the Telehealth Fund.

184.    Amber individually invested $200,000 in the Beauty Fund. Amber and John together invested $125,000 in the Telehealth Fund.

185.    In total, the Tullys have been damaged at least $325,000 by Defendants' actions.

<u>Brett McCoy</u>

186.    Brett McCoy is an investor in the Telehealth Fund and Beauty Fund.

187.    In total, McCoy invested $334,999 across the two Funds.

188.    McCoy made three (of four) investments on or after December 20, 2022—more than six months after the TSSB Order. During this time of investments, Krasovec, Ziv, Jawahar, and Urquijo were orchestrating the Beauty Fund Swap. McCoy had no knowledge of these actions from the General Partners and Urquijo.

189.    On at least one occasion, part of McCoy's investment was invested in a different fund than he authorized. For example, at least $83,333.33 was allocated from McCoy's Telehealth Fund into the Labs Fund without his knowledge and consent.

190.    In total, McCoy has been damaged at least $334,999.99 by Defendants' actions.

<u>The Manickams</u>

191.    Sundar and Soundharia Manickam are married. Together, they are investors in the Telehealth Fund.

192.    The Manickams invested $83,333.33 on April 20, 2022.

193.    Before their investment, on or about September 22, 2021, Sundar met with Krasovec at a hotel in downtown Cleveland, Ohio to discuss the investment opportunity.

194.    Before meeting with Krasovec, the Manickams were hesitant to invest solely with Jawahar.

195.    That hesitancy subsided after Sundar's one-on-one meeting with Krasovec where Krasovec succeeded in convincing the Manickams to invest in the Swiftarc Entities.

196.    After that meeting, the Manickams invested $83,333.33 into the Telehealth Fund.

197.    In total, the Manickams have been damaged in an amount of at least $83,333.33.

<u>Mazur Consultants</u>

198.    Mazur Consultants is an investor in both the Beauty and Labs Fund.

199.    Mazur Consultants originally invested in the SPV Fund in 2021. Mazur Consultants invested in the Beauty Fund that same year. Mazur Consultants invested $50,000 in both funds, for a total of $100,000.

200.    Before investing, Mazur Consultants were aware of Krasovec's and Ziv's involvement with Swiftarc Ventures, and comforted by their support and involvement, ultimately leading to Mazur Consultants' investment.

201.    On or about January 30, 2023, Mazur Consultants' investment in the SPV Fund was rolled over into the Labs Fund. To entice SPV Fund investors to rollover their investments, Swiftarc Ventures represented that "if you invested $100,000.00 in the Shine SPV, you will now

be a LP in the Labs Fund with a NAV of approximately $150,000.00," thus implying a $50,000 profit.

202.    Upon information and belief, that representation was false.

203.    Mazur Consultants also consented to the Beauty Fund Swap. However, as discussed above, Mazur Consultants' consent was not fully informed as the consent form Mazur Consultants executed contained material omissions.

204.    Krasovec and Ziv knew of these omissions yet failed to correct them despite having a duty to as general partners.

205.    In total, Mazur Consultants have been damaged in the amount of at least $100,000.

Cara Zale and the Crocker Trust

206.    Cara Zale and the Crocker Trust are investors in the Telehealth Fund.

207.    Mr. Crocker is a member of Cara Zale and a representative of the Crocker Trust.

208.    Before investing, Crocker met Krasovec on a Zoom call. Crocker believed Krasovec's backing and involvement were very important in his decision to invest capital. Specifically, Crocker would not have directed capital to the Telehealth Fund if Krasovec was not involved.

209.    In total, Cara Zale and Joseph K. Croker Trust invested $333,333.32 in the Telehealth Fund.

210.    Cara Zale and Joseph K. Croker Trust incurred at least $333,333.32 in damages from Defendants' actions.

Samir Haikal

211.    Haikal is an investor in the Telehealth Fund.

212.    Before making his investment, Haikal spoke with Jawahar and others. At the time, Haikal understood Krasovec and Ziv to be general partners of the Swiftarc Entities. Moreover, Jawahar relied on Krasovec's and Ziv's past successes as a selling point for Haikal to invest.

213.    On or about April 26, 2023, during Jawahar's supposed non-solicitation period as part of the Beauty Fund Swap, Haikal received a third capital call. However, Haikal did not make this payment.

214.    In total, Haikal invested $166,666.66 in the Swiftarc Telehealth Fund.

215.    Despite representations to the contrary, Haikal never received a statement reflecting his investments in the Swiftarc Telehealth Fund.

216.    Moreover, Haikal never received K-1s for tax years 2021, 2022, or 2023.

217.    Finally, while Jawahar claimed the Swiftarc Telehealth Fund invested in a portfolio company, Haikal had no proof to substantiate that claim.

218.    As a result of Defendants' actions, Haikal has suffered a loss of retirement, education, or other savings amounts.

219.    As a result of Defendants' actions, Haikal has been damaged in a minimum amount of $166,666.66.

Junto Green, LLC

220.    Junto Green is an investor in the SPV Fund.

221.    During Junto Green's first in-person meeting with Jawahar, Jawahar stated that he raised $50 million dollars for his consumer fund. This was a false statement.

222.    Junto Green understood both Krasovec and Ziv to be advisors to Jawahar and successful consumer executives and drew comfort from their involvement.

223.    Ultimately, Junto Green invested $25,000 into the SPV Fund.

224.    Junto Green, through its agents, demanded the return of its capital. To date, no capital has been returned.

225.    As a result of Defendants' actions, Junto Green has suffered a loss of retirement, education, or other savings amounts.

226.    As a result of Defendants' actions, Junto Green has been damaged in a minimum amount of $25,000.

<u>Harris</u>

227.    Harris is an investor in the SPV Fund.

228.    Relevant to Harris was Swiftarc Ventures partnership with Nottingham Spirk. However, that partnership, as discussed above, never materialized. Neither Krasovec nor Jawahar corrected this material misstatement.

229.    In total, Harris invested $300,000 into the SPV Fund.

230.    After numerous demands, Harris received a partial redemption in the amount of $125,000.

231.    As a result of Defendants' actions, Harris has been damaged in a minimum amount of $175,000.

<u>Ross Travis</u>

232.    Travis is an investor in the SPV Fund.

233.    In total, Travis invested $12,000.

234.    Through his representatives, Travis demanded a return of his investment.

235.    To date, Travis has not received his capital.

236.    In total, Travis has been damaged at least $12,000 by Defendants' actions.

237.    In total, Plaintiffs invested the following amounts across the following Funds:

| Plaintiff | Total Investment | Beauty Fund | Telehealth Fund | Labs Fund |
|-----------|-----------------|-------------|-----------------|-----------|
| Kahryn A. Bilski Revocable Trust | $666,666.66 | $250,000.00 | $166,666.66 | $250,000.00 |
| Carol A. Richardson Trust | $125,000.00 | -------- | $125,000.00 | -------- |
| Joanne Marie Holiday Revocable Trust | $1,049,999.33[2] | $250,000.00 | $83,333.33 | $116,666.00 |
| Elie Merheb | $583,333.00 | $250,000.00 | $208,333.00 | $125,000.00 |
| YTH 003, LLC | $1,100,000.00 | -------- | -------- | $1,100,000.00 |
| Amber & John Tully | $325,000.00 | $200,000.00 | -------- | $125,000.00 |
| Brett McCoy | $334,999.99 | $125,000.00 | $209,999.99 | -------- |
| Sundar & Soundharia Manickam | $83,333.33 | -------- | $83,333.33 | -------- |
| Marc Mazur Consultants, Inc. | $100,000.00 | $50,000.00 | -------- | $50,000.00 |
| Cara Zale, LLC | $166,666.00 | -------- | $166,666.00 | -------- |
| Joseph K. Crocker 2018 Irrevocable Trust | $166,666.00 | -------- | $166,666.00 | -------- |
| Samir Haikal | $166,666.66 | -------- | $166,666.66 | -------- |
| Junto Green, LLC* | $25,000.00 | -------- | -------- | -------- |
| Harris* | $175,000.00 | -------- | -------- | -------- |
| Ross Travis* | $12,000.00 | -------- | -------- | -------- |
| **Total:** | **$5,080,330.97** | **$1,125,000.00** | **$1,376,664.97** | **$1,766,666.00** |

## BASES OF ALLEGATIONS MADE UPON INFORMATION AND BELIEF

238.    Allegations made upon information and belief are based upon the following: the

Indictment filed against Jawahar dated December 20, 2023, *United States v. Jawahar*, No. 4:23-

CR-00718-MTS-SPM (E.D. Mo.); the Complaint filed against Jawahar in the Arizona Litigation,

---

[2] The Holiday Trust invested $600,000.00 with Jawahar through sidecar deals under the guise of Swiftarc Special Purpose Vehicles.

*Arizona Health Insurance Company, LLC et. al. v. Jawahar et. al.* No. 2:20-CV-01-46-SRB (D. Az.); the Complaint filed against Jawahar in the Texas Civil Litigation, *Cunningham et. al. v. Swiftarc Capital, LLC et. al.*, No. D-1-GN-21-005115 (53rd Dist., Tex.); the TSSB Order, *In the Matter of the Investment Adviser Registration of Swiftarc Capital*, No. IC22-REV-01; and emails, interviews, and other documents from Relevance Ventures, Swiftarc Ventures, the Swiftarc Funds, Jawahar, Krasovec, Ziv, EMPLOYEE 1 and EMPLOYEE 2. Moreover, Plaintiffs submit that all allegations made upon information and belief and all allegations concerning matters strictly within Defendants' possession and control will have evidentiary support after a reasonable opportunity for further investigation or discovery.

## CLAIMS FOR RELIEF

### COUNT I
### (VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT AND CORRESPONDING SEC RULE 10B-5)
### 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5

#### *All Plaintiffs v. All Defendants*
#### *(Jointly and severally)*

239.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

240.    Defendants wrongfully, intentionally, and with scienter, engaged in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails.

241.    Specifically, Defendants:

      a.        employed devices, schemes or artifices to defraud;

      b.      made untrue statements of material fact and omitted statements of material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or

      c.      engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

242.    Defendants knowingly, or with reckless disregard to the truth, made untrue statements of material fact to the Plaintiffs and others at the time of their initial purchase of limited partnership interests in the Swiftarc Funds, at the time of subsequent additional purchases, and at various times in between when Plaintiffs inquired about the status of their investments. During those relevant periods, Defendants also failed to state material facts which, in the light of the communications, rendered their statements misleading. These statements were made through the Offering Documents, Marketing Materials, and other oral and written communications. These statements include but are not limited to:

      a.      The omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the Arizona Litigation, the Texas Civil Litigation, and the TSSB investigation. These omissions make the Offering Documents, Marketing Materials, and other oral and written communications about the Swiftarc Entities, in the light of the circumstances in which they were issued, misleading because they fail to identify a significant and material risk associated with investing funds with Jawahar.

      b.      For those Plaintiffs who did not learn of the TSSB Order, the omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the TSSB Order—from the Offering Documents, the Marketing Materials, and other

oral and written communications. This omission makes the Offering Documents, the Marketing Materials, and other communications, in the light of the circumstances in which they were issued, misleading because it fails to identify a significant and material risk associated with investing funds with Jawahar.

c.     For those Plaintiffs who did learn of the TSSB Order, the material misrepresentation that Jawahar was not responsible for actions that gave rise to the TSSB Order and the underlying fraud. This statement is misleading because Jawahar was found, by order of the TSSB, to be responsible for fraud and was ordered to cease and desist from engaging in fraud.

d.     That Plaintiffs' investments were allocated to portfolio companies. This statement, as made by Jawahar and Urquijo—individually or as agents of the Swiftarc Entities—is misleading because, when those statements were made, Jawahar and Urquijo maintained a practice of using "intercompany loans," whereby limited partner funds were withdrawn from a fund without the limited partner's approval and used to satisfy partnership obligations, pay back other investors, and fund Jawahar's extravagant lifestyle. As made by the General Partners, these statements were made to Plaintiffs in the Offering Documents, the Marketing Materials, and in oral and written communication with reckless disregard for the truth of the statements. After learning of Jawahar's and Swiftarc Capital's past fraud, the General Partners made these statements without undertaking investigations to ensure that a known fraudster was not continuing to engage in illicit behavior.

e.    That Jawahar sought to separate from the Beauty Fund and the General Partners because of a difference in philosophies and Jawahar's overcommitment to the Beauty Fund to the detriment of the other two Swiftarc Funds. This statement is misleading because it was not a difference in philosophies, but Jawahar's past and present fraud that led the General Partners to pry the Beauty Fund away from Jawahar.

f.    That limited partners for each of the Swiftarc Funds would receive annual audited financial statements, annual reports (including an overview of the portfolio, quarterly valuations of the portfolio, quarterly summaries of new investments and dispositions made during the period), and scheduled K-1 tax documents and any other tax information reasonably requested by a limited partner. This statement is misleading because, during Plaintiffs' time as limited partners and up until the present, they have not received any audited financial statements, reports, or quarterly valuations. Further, they have only received a single K-1 tax document; the Beauty Fund provided a 2022 K-1 on or about June 12, 2023.

243.    By operating the Ponzi-like scheme described above, Defendants employed devices, schemes, or artifices with the intent to knowingly defraud Plaintiffs and other investors. Jawahar's operation of the Swiftarc Funds as a Ponzi-like scheme, contrary to his representations to Plaintiffs, other investors, and other employees of Swiftarc Ventures, constituted a course of conduct that operated as a fraud upon Plaintiffs and others. The scheme was perpetrated by carrying out a variety of acts contemporaneously with the above untrue statements, including but not limited to:

a.  soliciting investments with no intention to appropriately invest the funds into portfolio companies;

b.  publishing Offering Documents and Marketing Materials that contained materially false statements;

c.  generating false bank statements to demonstrate to employees that funds were not misappropriated; and

d.  providing Plaintiffs with false statements of profit to induce further investments.

244.  Plaintiffs and others relied on the misrepresentations of Defendants in purchasing limited partnership interests in the Swiftarc Funds and further relied on their course of conduct in managing the Swiftarc Funds as justifying their continued investment as limited partners in the Swiftarc Funds.

245.  Based on the Indictment returned against Jawahar, along with Jawahar's pattern of avoiding and evading requests for redemption, Plaintiffs believe that all their investments have been squandered and stolen by Jawahar or otherwise having little or no value.

246.  Jawahar's misappropriation of funds, together with his extensive operation of a Ponzi scheme, gives rise to a strong inference that the material misstatements and omissions were made with the requisite scienter.

247.  Urquijo and the General Partners maintained a professional relationship with Jawahar for many years. These relationships involved co-founding and running the same vehicles of fraud Jawahar was using to defraud Plaintiffs and others. Urquijo's and the General Partners' significant involvement in the Swiftarc Entities gives rise to a strong inference that they made material misstatements and omissions with reckless disregard for the truth—with scienter.

248.    Therefore, Plaintiffs compensatory damages are equal to the amount invested with Defendants.

249.    The misrepresentations above legally and proximately caused Plaintiffs' losses. Defendants' misrepresentations created a risk that Jawahar, a known fraudster, would misappropriate Plaintiffs' funds. If Defendants had not materially misrepresented the above information, Plaintiffs would have either refused to invest or, at the very least, demanded additional third-party safeguards such as internal controls, regular audits, and due diligence.

250.    Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

251.    Plaintiffs are entitled to damages, prejudgment interest, punitive damages, attorney's fees and costs and expenses for the violations by Defendants of the Security Exchange Act, § 10(b), 15 U.S.C. § 78j(b).

**COUNT II**
**VIOLATION OF SECTION 20(a) OF**
**THE SECURITIES AND EXCHANGE ACT OF 1934**
**15 U.S.C. § 78t(a)**

*All Plaintiffs v. Jawahar; Urquijo; Krasovec; and Ziv*
*(Jointly and severally with the Defendants of Count I)*

252.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

253.    Pursuant to Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

254.    To the extent that Jawahar, Urquijo, or the General Partners did not make the material misrepresentations that induced Plaintiffs and others to invest, Jawahar, Urquijo, and the General Partners acted as a control person of the Swiftarc Entities that, in fact, made the material misrepresentations.

255.    Jawahar, as the managing member of Swiftarc Ventures and an owner and manager of each of the GP LLCs, exercised control over the Swiftarc Entities and their actions, including each entity's ability to make the false representations to Plaintiffs and others described above. This control included the ability of Jawahar to review, approve, and order the dissemination of Offering Documents and Marketing Materials that contained material misrepresentations.

256.    Urquijo, as the president of Swiftarc Ventures, exercised control over the Swiftarc Entities and their actions, including each entity's ability to make the false representations to Plaintiffs and others described above. This control included the ability of Urquijo to review, approve, and order the dissemination of the Offering Documents and Marketing Materials that contained material misrepresentations.

257.    Krasovec, as a general partner of the Swiftarc Funds and Swiftarc Ventures, exercised control over the Swiftarc Entities and their actions, including each entity's ability to make the false representations to Plaintiffs and others described above. This control included the ability of Krasovec to review, approve, and order the dissemination of the Offering Documents and Marketing Materials that contained material misrepresentations, in addition to making oral statements to Plaintiffs to solicit, and regarding, their investments.

258.     Ziv, as a general partner of the Swiftarc Funds and Swiftarc Ventures, exercised control over the Swiftarc Entities and their actions, including each entity's ability to make the false representations to Plaintiffs and others described above. This control included the ability of Ziv to review, approve, and order the dissemination of the Offering Documents and Marketing Materials that contained material misrepresentations, in addition to making oral statements to Plaintiffs to solicit, and regarding, their investments.

259.     Jawahar, Urquijo, and the General Partners, directly and indirectly, induced the Swiftarc Entities to make material misrepresentations to Plaintiffs and others. In doing so, Jawahar, Urquijo, and the General Partners acted in bad faith, as evidenced by their failure to inform the limited partners when each committed or became aware of fraud, their taking part and/or acquiescing in the comingling of the Swiftarc Funds' financial accounts, Jawahar's spending of investor money to repay other investors and fund his extravagant lifestyle, and the General Partners' orchestration of an exit for themselves by way of the Beauty Fund Swap.

260.     As a result, Jawahar, Urquijo, and the General Partners, to the extent that they are not directly liable under Section 10(b) of the Exchange Act as set forth in Count One, are jointly and severally liable for the material misrepresentations made to Plaintiffs by the entities they controlled. Plaintiffs are entitled to damages at an amount to be determined at trial.

### COUNT III
### VIOLATIONS OF THE DELAWARE SECURITIES ACT
### Del. Code. Ann. tit. 6, § 73-101 *et seq.*

#### *All Plaintiffs v. All Defendants*
#### *(Jointly and Severally)*

261.     Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

262.    Defendants, in connection with the Plaintiffs' purchase of securities directly and indirectly, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they are made, not misleading.

263.    These material misstatements and omissions include, but are not limited to, the following:

a.    The omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the Arizona Litigation, the Texas Civil Litigation, and the TSSB investigation. These omissions make the Offering Documents, Marketing Materials, and other oral and written communications about the Swiftarc Entities, in the light of the circumstances in which they were issued, misleading because it fails to identify a significant and material risk associated with investing funds with Jawahar.

b.    For those Plaintiffs who did not learn of the TSSB Order, the omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the TSSB Order—from the Offering Documents, the Marketing Materials, and other oral and written communications. This omission makes the Offering Documents, the Marketing Materials, and other communications, in the light of the circumstances in which they were issued, misleading because it fails to identify a significant and material risk associated with investing funds with Jawahar.

c.    For those Plaintiffs who did learn of the TSSB Order, the material misrepresentation that Jawahar was not responsible for actions that gave rise

to the TSSB Order and the underlying fraud. This statement is misleading because Jawahar was found, by order of the TSSB, to be responsible for fraud and was ordered to cease and desist from engaging in fraud.

d. That Plaintiffs' investments were allocated to portfolio companies. This statement, as made by Jawahar and Urquijo—individually or as agents of the Swiftarc Entities—is misleading because, when those statements were made, Jawahar and Urquijo maintained a practice of using "intercompany loans," whereby limited partner funds were withdrawn from a fund without the limited partner's approval and used to satisfy partnership obligations, pay back other investors, and fund Jawahar's extravagant lifestyle. As made by the General Partners, these statements were made to Plaintiffs in the Offering Documents, the Marketing Materials, and in oral and written communication with reckless disregard for the truth of the statements. After learning of Jawahar's and Swiftarc Capital's past fraud, the General Partners made these statements without undertaking investigations to ensure that a known fraudster was not continuing to engage in illicit behavior.

e. That Jawahar sought to separate from the Beauty Fund and the General Partners because of a difference in philosophies and Jawahar's overcommitment to the Beauty Fund to the detriment of the other two Swiftarc Funds. This statement is misleading because it was not a difference in philosophies, but Jawahar's past and present fraud that led the General Partners to pry the Beauty Fund away from Jawahar.

f.     That limited partners for each of the Swiftarc Funds would receive annual audited financial statements, annual reports (including an overview of the portfolio, quarterly valuations of the portfolio, quarterly summaries of new investments and dispositions made during the period), and scheduled K-1 tax documents and any other tax information reasonably requested by a limited partner. This statement is misleading because, during Plaintiffs' time as limited partners and up until the present, they have not received any audited financial statements, reports, or quarterly valuations. Further, they have only received a single K-1 tax document; the Beauty Fund provided a 2022 K-1 on or about June 12, 2023.

264.     At the time each of these misstatements and material omissions were made to Plaintiffs to induce their investment in the Swiftarc Funds, Defendants knew the falsity of the statements and that, as to the omissions, the Offering Documents, Marketing Materials, and other oral and written communications were misleading by not identifying Jawahar's past and present fraud.

265.     To the extent that Jawahar, Urquijo, and the General Partners did not offer or sell securities, Jawahar, Urquijo, Krasovec and Ziv acted as partners, officers, or directors of the seller, or at a minimum occupied a similar status and performed similar functions. Jawahar acted as the co-founder of the Swiftarc Entities. Urquijo acted as the President of Swiftarc Ventures and controlled the day-to-day operations of the Swiftarc Entities, including their bank accounts and employees. The General Partners founded and acted as high-level executives for the Swiftarc Entities, deciding on strategic planning with Jawahar, sitting on the investment and governance

committee, soliciting new investors and securing their investment, and providing feedback and counsel to Jawahar and other Swiftarc Ventures employees.

266.    To the extent that Jawahar, Urquijo, and the General Partners were unaware of Jawahar's past or present fraud; past litigation against Jawahar and Swiftarc Capital; Jawahar's and the Swiftarc Entities' misappropriation of funds for illicit purposes; and the Swiftarc Entities' failure to make available financial disclosures and tax documents to the Plaintiffs; each Defendant could have, in the exercise of reasonable care, discovered the misstatements and omissions as a consequence of their various roles with the Swiftarc Entities.

267.    As a result of the Defendants' material misstatements and omissions, Plaintiffs were induced into purchasing limited partnership interests of the various Swiftarc Funds and, as a direct result of the fraud, suffered damages. Plaintiffs therefore are entitled to recover the consideration paid for their limited partnership interests, together with interest at the legal rate from the date of purchase, costs, and reasonable attorneys' fees.

<u>COUNT IV</u>
**COMMON LAW FRAUD**

***All Plaintiffs v. All Defendants***

268.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

269.    By engaging in the conduct described above, Defendants committed common law fraud against Plaintiffs and others.

270.    Specifically, Defendants:

a.    made false representations of fact;

b.    were aware that those representations were false, or the representations were made with reckless indifference to the truth;

     c.     made the false representations with the intent to induce Plaintiffs and others to act, namely, by investing in the Swiftarc Funds;

     d.     induced the justifiable reliance by Plaintiffs and others upon the representations made; and

     e.     caused damages to Plaintiffs and others to result as a consequence of their reliance on the Defendants' intentional misrepresentations.

271.    Moreover, the fraud in which Defendants engaged was gross, oppressive, or aggravated, or involves a breach of trust or confidence.

272.    The false representations of fact include, but are not limited to, the following:

     a.     The omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the Arizona Litigation, the Texas Civil Litigation, and the TSSB investigation. These omissions make the Offering Documents, Marketing Materials, and other oral and written communications about the Swiftarc Entities, in the light of the circumstances in which they were issued, misleading because they fail to identify a significant and material risk associated with investing funds with Jawahar.

     b.     For those Plaintiffs who did not learn of the TSSB Order, the omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the TSSB Order—from the Offering Documents, the Marketing Materials, and other oral and written communications. This omission makes the Offering Documents, the Marketing Materials and other communications, in the light of the circumstances in which they were issued, misleading because it fails

to identify a significant and material risk associated with investing funds with Jawahar.

c.   For those Plaintiffs who did learn of the TSSB Order, the material misrepresentation that Jawahar was not responsible for actions that gave rise to the TSSB Order and the underlying fraud. This statement is misleading because Jawahar was found, by order of the TSSB, to be responsible for fraud and was ordered to cease and desist from engaging in fraud.

d.   That Plaintiffs' investments were allocated to portfolio companies. This statement, as made by Jawahar and Urquijo—individually or as agents of the Swiftarc Entities—is misleading because, when those statements were made, Jawahar and Urquijo maintained a practice of using "intercompany loans," whereby limited partner funds were withdrawn from a fund without the limited partner's approval and used to satisfy partnership obligations, pay back other investors, and fund Jawahar's extravagant lifestyle. As made by the General Partners, these statements were made to Plaintiffs in the Offering Documents, the Marketing Materials, and in oral and written communication with reckless disregard for the truth of the statements. After learning of Jawahar's and Swiftarc Capital's past fraud, the General Partners made these statements without undertaking investigations to ensure that a known fraudster was not continuing to engage in illicit behavior.

e.   That Jawahar sought to separate from the Beauty Fund and the General Partners because of a difference in philosophies and Jawahar's overcommitment to the Beauty Fund to the detriment of the other two

Swiftarc Funds. This statement is misleading because it was not a difference in philosophies, but Jawahar's past and present fraud that led the General Partners to pry the Beauty Fund away from Jawahar.

      f.     That limited partners for each of the Swiftarc Funds would receive annual audited financial statements, annual reports (including an overview of the portfolio, quarterly valuations of the portfolio, quarterly summaries of new investments and dispositions made during the period), and scheduled K-1 tax documents and any other tax information reasonably requested by a limited partner. This statement is misleading because, during Plaintiffs' time as limited partners and up until the present, they have not received any audited financial statements, reports, or quarterly valuations. Further, they have only received a single K-1 tax document; the Beauty Fund provided a 2022 K-1 on or about June 12, 2023.

273.    In reliance on the material misrepresentations made by Defendants, Plaintiffs invested their money. Because Plaintiffs relied on the involvement of the General Partners, the promise to invest in portfolio companies, the trustworthiness of Jawahar, and the assurance that Plaintiffs would receive financial documents, Plaintiffs were given a false sense of security and, as a direct and proximate consequence, Defendants were able to defraud them.

274.    Plaintiffs are entitled to damages, prejudgment interest, and punitive damages based on the fraud committed by Defendants.

**COUNT V**
**CIVIL CONSPIRACY**

***All Plaintiffs v. All Defendants***

275.     Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

276.     Defendants knowingly formed an agreement with one another and each other to defraud Plaintiffs of the money that Plaintiffs invested in exchange for limited partnership interests in the Swiftarc Funds and SPV Fund, respectively.

277.     In furtherance of the conspiracy, Defendants knowingly made material misstatements and omissions, including, but not limited to:

    a.     The omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the Arizona Litigation, the Texas Civil Litigation and the TSSB investigation. These omissions make the Offering Documents, Marketing Materials, and other oral and written communications about the Swiftarc Entities, in the light of the circumstances in which they were issued, misleading because they fail to identify a significant and material risk associated with investing funds with Jawahar.

    b.     For those Plaintiffs who did not learn of the TSSB Order, the omission of Jawahar's and Swiftarc Capital's past fraud as it relates to the TSSB Order—from the Offering Documents, the Marketing Materials, and other oral and written communications. This omission makes the Offering Documents, the Marketing Materials and other communications, in the light of the circumstances in which they were issued, misleading because it fails

to identify a significant and material risk associated with investing funds with Jawahar.

c. For those Plaintiffs who did learn of the TSSB Order, the material misrepresentation that Jawahar was not responsible for actions that gave rise to the TSSB Order and the underlying fraud. This statement is misleading because Jawahar was found, by order of the TSSB, to be responsible for fraud and was ordered to cease and desist from engaging in fraud.

d. That Plaintiffs' investments were allocated to portfolio companies. This statement, as made by Jawahar and Urquijo—individually or as agents of the Swiftarc Entities—is misleading because, when those statements were made, Jawahar and Urquijo maintained a practice of using "intercompany loans," whereby limited partner funds were withdrawn from a fund without the limited partner's approval and used to satisfy partnership obligations, pay back other investors, and fund Jawahar's extravagant lifestyle. As made by the General Partners, these statements were made to Plaintiffs in the Offering Documents, the Marketing Materials, and in oral and written communication with reckless disregard for the truth of the statements. After learning of Jawahar's and Swiftarc Capital's past fraud, the General Partners made these statements without undertaking investigations to ensure that a known fraudster was not continuing to engage in illicit behavior.

e. That Jawahar sought to separate from the Beauty Fund and the General Partners because of a difference in philosophies and Jawahar's overcommitment to the Beauty Fund to the detriment of the other two

– 52 –

Swiftarc Funds. This statement is misleading because it was not a difference in philosophies, but Jawahar's past and present fraud that led the General Partners to pry the Beauty Fund away from Jawahar.

     f.     That limited partners for each of the Swiftarc Funds would receive annual audited financial statements, annual reports (including an overview of the portfolio, quarterly valuations of the portfolio, quarterly summaries of new investments and dispositions made during the period), and scheduled K-1 tax documents and any other tax information reasonably requested by a limited partner. This statement is misleading because, during Plaintiffs' time as limited partners and up until the present, they have not received any audited financial statements, reports, or quarterly valuations. Further, they have only received a single K-1 tax document; the Beauty Fund provided a 2022 K-1 on or about June 12, 2023.

278.    The above material misstatements and omissions and losses flowing therefrom constitute violations of the federal securities law, state securities law, various other state statutes, and state common law.

279.    Plaintiffs relied on the material misstatements and omissions Defendants made in furtherance of the conspiracy when they purchased limited partnership interests in the Swiftarc Funds and SPV Fund, respectively.

280.    Based on the Indictment returned against Jawahar, along with Jawahar's pattern of avoiding and evading requests for redemptions, Plaintiffs believe the money they invested in exchange for their limited partnership interests has been squandered.

281.    Defendants engaged in the conspiracy to defraud Plaintiffs for the purpose of satisfying partnership obligations, paying back other investors, and funding Jawahar's extravagant lifestyle.

282.    Additionally, among other reasons stated throughout this Complaint, Krasovec and Ziv specifically engaged in the conspiracy to defraud Plaintiffs, namely by engaging in the Beauty Fund Swap without complete disclosure to Plaintiffs, to protect their own interests at Plaintiffs' expense.

283.    As a direct, proximate, and foreseeable consequence of Defendants' actions, plaintiffs have suffered damages.

284.    Plaintiffs are entitled to damages, prejudgment interest, and punitive damages as a result of Defendants' conspiracy.

## <u>COUNT VI</u>
## BREACH OF FIDUCIARY DUTY

*All Plaintiffs v. Jawahar; Urquijo; Krasovec; Ziv;*
*Swiftarc Ventures; and the GP LLCs*

285.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

286.    Jawahar, Urquijo, Krasovec, Ziv, Swiftarc Ventures, and the GP LLCs owed Plaintiffs and others a fiduciary duty. Specifically:

a.    The GP LLCs owed Plaintiffs and others a fiduciary duty by nature of their status as general partners of the Swiftarc Funds, in which Plaintiffs and others were limited partners.

b.    Swiftarc Ventures owed Plaintiffs and others a fiduciary duty by nature of its role as the investment manager of the Swiftarc Funds.

– 54 –

287.    Jawahar and the General Partners owe fiduciary duties to Plaintiffs by nature of their status as general partners of the Swiftarc Funds.

288.    By engaging in the conduct described above, Jawahar, Urquijo, the General Partners, and the GP LLCs breached their fiduciary duties owed to Plaintiffs and others. Specifically, the following breaches occurred:

a.      The GP LLCs, Swiftarc Ventures, Jawahar, and Urquijo breached their fiduciary duties to Plaintiffs and others by providing funds to the other Swiftarc Funds—via so-called "intercompany loans"—without any paperwork, collateral, record, or consent of the Plaintiffs. The GP LLCs, Swiftarc Ventures, Jawahar, and Urquijo used Plaintiffs' investments to benefit themselves by paying off other debts and redemption requests at the expense of Plaintiffs and others.

b.      Jawahar breached his fiduciary duty by comingling personal assets among the Swiftarc Funds and using investor money to fund his extravagant lifestyle.

c.      Jawahar, Urquijo, the General Partners, and the GP LLCs breached their fiduciary duties when they failed to disclose to new and prospective investors, including Plaintiffs, that Jawahar and Swiftarc Capital had been ordered to *cease and desist from engaging in fraud* by the TSSB. Similarly, those Defendants breached their fiduciary duty by failing to inform prospective and new investors that Jawahar's and Krasovec's former investment firm, Swiftarc Capital, had been sued for fraudulent activity on two prior occasions, along with Jawahar personally.

d.     Jawahar breached his fiduciary duty when he failed to disclose to the limited partners of the Beauty Fund all material information related to the Beauty Fund Swap. Jawahar hid the cover sheet, which explained that Jawahar committed fraud and was disciplined by the TSSB, to secure the consent of limited partners for the Beauty Fund Swap to occur. In doing so, Jawahar put his own interests above those of the limited partners by fraudulently inducing the limited partners to consent to the Beauty Fund Swap.

e.     The General Partners breached their fiduciary duties by failing to conduct due diligence or ensure that no fraudulent activity was occurring with Swiftarc Entities and Jawahar. In doing so, the General Partners recklessly risked the security of Plaintiffs' investments.

f.     The General Partners breached their fiduciary duties by orchestrating the Beauty Fund Swap. Rather than putting Plaintiffs and others on notice that Jawahar was using the Swiftarc Funds to engage in fraud and that he has done the same thing before, Krasovec and Ziv forced Jawahar to hand over the remnants of one Swiftarc Fund. Only after the General Partners orchestrated and executed a favorable exit for themselves did they inform the Plaintiffs of the fraud occurring at Swiftarc Ventures. The Beauty Fund Swap effectively hung Plaintiffs in the Telehealth Fund and Labs Fund—to whom Krasovec and Ziv owed fiduciary duties—out to dry.

289.    As a result, Plaintiffs are entitled to all damages, at an amount to be determined at trial, that resulted from the Defendants' breach of fiduciary duties.

## COUNT VII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *All Plaintiffs v. Jawahar; Urquijo; Krasovec; Ziv; and Swiftarc Ventures*
### (In the alternative to Count VI)

290.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

291.    A showing of aiding and abetting a breach of fiduciary duty requires the following:

    a.    the existence of a fiduciary relationship;

    b.    a breach of fiduciary duty;

    c.    a defendant, who is not a fiduciary, knowingly participated in the breach; and

    d.    damages to a plaintiff result from the concerted action of the fiduciary and the non-fiduciary.

292.    In the alternative to a direct breach of fiduciary duty by Jawahar, Urquijo, Krasovec, Ziv, and Swiftarc Ventures, those five defendants aided and abetted the breach by the GP LLCs, Swiftarc Ventures, and/or Jawahar of their fiduciary duties to Plaintiffs and others.

293.    Jawahar, Urquijo, Krasovec, Ziv, and Swiftarc Ventures, to the extent they did not owe a fiduciary duty to Plaintiffs and others, at a minimum knowingly participated in the GP LLCs' breaches of their fiduciary duties. Specifically, Jawahar and Urquijo both authorized so-called "intercompany loans" and the disbursements from the Swiftarc Funds to Jawahar. Krasovec, who co-owned Swiftarc Capital with Jawahar, continued to do business with Jawahar and solicit new investors into Swiftarc Ventures *after Jawahar had been civilly sued and ordered to cease and desist from engaging in fraud*. Krasovec and Ziv encouraged the Swiftarc Funds, and their

respective GP LLCs, to retain Jawahar, at that point a known fraudster, as the person responsible for the investment of the Telehealth Fund and the Labs Fund after the Beauty Fund Swap.

294.    Plaintiffs and others, as a result of the participation of Jawahar, Urquijo, Krasovec, Ziv, and Swiftarc Ventures in the GP LLCs', Swiftarc Ventures', and/or Jawahar's breaches of their fiduciary duties, suffered damages.

295.    As a result, Plaintiffs are entitled to damages caused by those breaches at an amount to be determined at trial.

**COUNT VIII**
**LIABILITY OF A PURPORTED PARTNER**
**Del. Code. Ann. tit. 6 § 15-308**

***All Plaintiffs v. Jawahar; Krasovec; Ziv***
**(In the alternative to Count VI)**

296.    Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

297.    To the extent that Jawahar, Krasovec, and Ziv are not, at law, general partners of the Swiftarc Funds, they are liable to Plaintiffs and others, jointly and severally with the GP LLCs, for all transactions into which Plaintiffs and others entered because they held themselves out as general partners.

298.    Delaware law states:

> If a person by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with 1 or more persons not partners, the purported partner is liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership. … If a partnership obligation results, the purported partner is liable with respect to that obligation jointly and severally with any other person consenting to the representation.

Del. Code. Ann. tit. 6 § 15-308.

299.    During all relevant times, Jawahar, Krasovec, and Ziv were represented, and represented themselves, as general partners of the Swiftarc Funds. For example, in the PPMs for the Swiftarc Funds, Jawahar, Krasovec, and Ziv are listed as general partners of the Swiftarc Funds. On or about August 2021, a Confidential Executive Overview published by Swiftarc Ventures and sent to Plaintiffs listed Krasovec, Ziv, and others as general partners. Several other documents published by Swiftarc Ventures listed Krasovec, Ziv, and Jawahar as general partners. Plaintiffs each received, and relied upon, these documents from Swiftarc Ventures before and after they invested with the Swiftarc Funds.

300.    Plaintiffs invested with Jawahar and Swiftarc Ventures in large part because Krasovec and Ziv, who were held out as successful, wealthy, and prominent businessmen in the marketplace, represented themselves and consented to be represented as general partners of Swiftarc Ventures and/or the Swiftarc Funds.

301.    Jawahar, Krasovec, and Ziv purported to be partners in their words and conduct toward Plaintiffs. Moreover, Jawahar, Krasovec, and Ziv consented to be represented as general partners when they became aware that Swiftarc Ventures and the Swiftarc Funds were advertising each of them as general partners in the Offering Documents and Marketing Materials but failed to object to that representation.

302.    Ziv maintains on his public-facing "LinkedIn" page that, from January 2019 to April 2023, he was a co-founder and ***General Partner*** of Swiftarc Ventures.

303.    Based on representations that Krasovec, Ziv, and Jawahar were general partners of the Swiftarc Funds, Plaintiffs agreed to invest their money into the Swiftarc Funds in exchange for limited partnership interests.

304.     Plaintiffs' investments created mutual obligations between Plaintiffs on the one hand, and Krasovec, Ziv, and Jawahar on the other. Plaintiffs were required to invest their funds as agreed upon. In exchange, Krasovec, Ziv, and Jawahar had obligations to abide by the agreements and their fiduciary duties arising under the law.

305.     By providing title to limited partnership interests that were exposed to, or that they knew had a significant risk of being exposed to, fraud, the GP LLCs, Jawahar, Krasovec, and Ziv failed to satisfy their obligations as partners to Plaintiffs.

306.     By representing themselves as general partners of the Swiftarc Funds, and Plaintiffs' reliance upon those representations when investing in the Swiftarc Funds, Krasovec, Ziv, and Jawahar are jointly and severally liable with the Swiftarc Entities to Plaintiffs for the misconduct set forth in detail in this Complaint and the damages arising therefrom in an amount to be determined at trial.

<u>**COUNT IX**</u>
**UNJUST ENRICHMENT**

***All Plaintiffs v. All Defendants***
**(In the alternative to Counts I – VIII)**

307.     Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth at length herein.

308.     To the extent that the above causes of action provide no remedy at law, Defendants have unjustly enriched themselves at the expense of Plaintiffs and others and should be disgorged of those gains.

309.     When no other remedies at law are available, unjust enrichment is properly shown where there is: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; and (4) the absence of justification.

310.    Defendants were all enriched. In total, the Swiftarc Funds acquired over five million dollars from Plaintiffs. The Swiftarc Funds were enriched when Plaintiffs' monies were deposited. The GP LLCs were similarly enriched by the increase in value of the Swiftarc Funds. Jawahar enriched himself by using investments to pay other outstanding debts and redemption requests, as well as using investor money to fund his extravagant lifestyle.

311.    Krasovec and Ziv were enriched due to the so-called "intercompany loans." Investor money that was invested into either the Telehealth Fund or the Labs Fund was, upon information and belief, reallocated to the Beauty Fund. As owners of the new general partner of the Beauty Fund, both Krasovec's and Ziv's interest in the general partner has been inflated due to the improper transfer of Plaintiffs' money to the Beauty Fund.

312.    Plaintiffs and the other investors have been impoverished. Plaintiffs invested over five million dollars into the Swiftarc Funds and, based on the Indictment returned against Jawahar, Plaintiffs believe that money has been completely squandered. Plaintiffs' countless redemption requests have been dismissed, ignored, or flat out denied by Jawahar and others.

313.    Plaintiffs' loss of over five million dollars is directly related to the enrichment of Defendants.

314.    No justification existed for the comingling of Swiftarc Fund assets, the use of Plaintiffs' investments to redeem earlier investors, and the withdrawal by fiat of Jawahar to fund travels, trips, multiple apartments, expensive restaurants, and the like.

315.    As a result, in the alternative to the preceding Counts I – VIII alleged herein, Plaintiffs are entitled to damages equal to the amount that they were impoverished and Defendants were enriched, the amount of which is to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request this Honorable Court enter judgment in Plaintiffs' favor and against Defendants, jointly and severally, as follows:

A.      Issue an Order: (1) freezing the assets of Jawahar and the Swiftarc Entities until further Order of the Court; (2) preventing the Defendants from destroying or altering documents; and (3) requiring the Defendants to file with this Court, within twenty days, a sworn written accounting of all assets belonging to Plaintiffs within their possession, custody or control, along with proof thereof.

B.      Issue an Order requiring the Defendants to disgorge all ill-gotten profits or proceeds, or any assets or liabilities purchased with the same, received as a result of their acts and/or courses of conduct complained of herein, with prejudgment interest.

C.      Award Plaintiffs compensatory, consequential, punitive, and statutory damages in an amount to be established at trial.

D.      Grant post-judgment interest at the maximum legal rate, attorneys' fees and costs, and such other and further relief as may be necessary and appropriate; and

E.      Plaintiffs respectfully request that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Plaintiffs for additional relief within the jurisdiction of this Court.

Respectfully submitted,

Christos N. Georgalis (OH: 0079433)
Patrick M. Rahill (OH: 0093556)
Scott M. Stevenson (OH: 0103211)
Flannery | Georgalis, LLC

1375 East Ninth St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2120
chris@flannerygeorgalis.com
prahill@flannerygeorgalis.com
sstevenson@flannerygeorgalis.com

*Attorneys for Plaintiffs*